

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00037-CV

_____

SANFORD CRAYTON, Appellant

V.

HOMEOWNERS OF AMERICA INSURANCE COMPANY, Appellee

On Appeal from the 153rd District Court
Tarrant County, Texas
Trial Court No. 153-283785-16

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

## I. Introduction

Appraisal under an insurance policy involves a contractual process by which the insurer and the insured select third parties to determine the amount of a claimed loss when the insurer and the insured cannot agree what the amount of the loss is. *Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806 (Tex. 2019) (Hecht, C.J., dissenting). This appeal poses the question of how an insurer's payment of an appraisal award triggers the deadlines and penalties of the act that requires insurers to timely process and pay insurance claims—the Texas Prompt Payment of Claims Act (the TPPCA or the Act). *See* Tex. Ins. Code Ann. §§ 542.051–.061.

How the appraisal process and the TPPCA relate to each other was recently explored by the Texas Supreme Court in *Barbara Technologies*. The majority opinion and Justice Boyd's concurring and dissenting opinion (hereinafter referred to as the concurrence)[1] in *Barbara Technologies* offered fresh interpretations on whether the payment of an appraisal award created liability under the TPPCA and on what various

---

[1]As explained below, we utilize the concurrence in *Barbara Technologies* because Justice Boyd conducted a thorough statutory analysis of the interplay between Insurance Code Sections 542.058 and 542.060—an analysis that the majority in *Barbara Technologies* did not conduct because the parties did not brief the interplay between those two sections and because it was not necessary to the majority's analysis. *See* 589 S.W.3d at 824 (majority opinion). Although *Barbara Technologies* also includes a dissenting opinion by Chief Justice Hecht, joined by Justices Brown and Blacklock, that dissenting opinion merely references Section 542.058 and 542.060 but does not include a statutory analysis of the interplay between the two sections. *See id.* at 848–49 (Hecht, C.J., dissenting).

terms of the Act mean. These fresh interpretations of the interrelation of the appraisal process and the TPPCA create a host of questions that impact our resolution of this appeal.

The suit below arose from a claim by the insured, Appellant Sanford Crayton, for a wind and hail claim on his homeowner's policy against his insurer, Appellee Homeowners of America Insurance Company. Eventually, Crayton's claims boiled down to the question of whether Homeowners violated the TPPCA by initially rejecting his claim but later paying an appraisal award on the claim after Crayton sued.

Homeowners filed a combined no-evidence and traditional motion for summary judgment raising grounds that Crayton could not establish a violation of the TPPCA. Crayton responded without offering any evidence of his own that Homeowners' original claim decision was flawed. Instead, Crayton relied on the fact that the appraisal award was several times higher than the damages in the original adjustment that was the basis for Homeowners' original rejection of his claim. Based on this disparity, he argued that a fact issue existed on Homeowners' TPPCA liability. In Crayton's view, the disparity raised issues regarding (1) whether Homeowners' original adjustment was flawed and (2) whether Homeowners should not have originally rejected the claim on the basis that Crayton's damages fell below his deductible. The resolution of those fact issues would show that Homeowners had violated the TPPCA's deadlines because it had not timely paid what it should have when the claim was originally presented.

The trial court granted Homeowners' motion. Crayton raises two issues: one challenges the granting of the no-evidence portion of Homeowners' motion, and the other challenges the granting of the traditional motion. We affirm the trial court's granting of Homeowners' no-evidence motion.

As we read *Barbara Technologies*, Homeowners' payment of the appraisal did not constitute a retroactive acceptance of Crayton's claim that triggered the TPPCA's deadlines. Nor did the payment of the appraisal award have probative value as to whether Homeowners' original claim decision was in error such that it raised a fact issue as to Homeowners' liability. Finally, we disagree with the concurrence that when an insurer pays an appraisal award after a sixty-day deadline contained in one of the Act's provisions, there is a violation of the TPPCA and that the insurer can free itself from that violation only by proving that it had no liability because the insured's claim is "invalid."

## II. Factual and procedural background

The underlying facts are not disputed. Homeowners issued a Texas homeowner's policy insuring Crayton's residence. In October 2014, Crayton filed a claim for storm damage that Homeowners acknowledged the same day that it was received.

Two days after the claim was filed, an adjuster from an independent adjusting agency visited Crayton's property and investigated the claim. The adjuster concluded that the damage to Crayton's dwelling totaled approximately $300 calculated on the

4

basis of both a replacement cost value and an actual cash value. The adjuster also assessed the damage to a fence and to an outbuilding as totaling approximately $2,200 calculated on both a replacement cost value and an actual cash value.

The adjuster's report contained the following description of the loss adjustment:

Loss Adjustment:

Please see the attached estimate for damages noted during inspection. Specific damages consisted of 8 damaged shingles on the right slope and 10 damaged shingles on the left slope. There was no visible damage to the front or rear slopes of the dwelling roof. I inspected the interior of the dwelling and found no visible storm damage.

Other Structure: There was wind damage to the shared cedar wood fence. There was 128' of damaged fencing and our estimate is to repair 64'. There was wind damage to the shingles on the storage shed on the front and rear slopes. The wind lifted the shingles pulling through the fasteners.

The attached estimate represents an agreed scope with the insured's contractor Joel Carriker with Trinity Roofing and Mrs. Crayton.

Overhead and profit not applied to estimate.

Depreciation applied based on age on the roofs. No depreciation applied to fencing being repaired.

Within six days of the inspection, Homeowners notified Crayton by letter of the adjuster's findings and of the fact that the estimated damages were less than his policy's deductible. Homeowners' letter told Crayton that he should notify

Homeowners should additional damage be found or if a contractor doing repairs estimated the damage to be higher than the adjuster's findings.

The record reflects no more communication between Crayton and Homeowners until more than a year after Homeowners' letter when, in January 2016, counsel for Crayton sent Homeowners a demand letter claiming that Homeowners had failed to adequately adjust and pay Crayton's claim. The demand letter enumerated a number of alleged unfair settlement practices and misrepresentations of the insurance policy. The letter claimed that Crayton's property had suffered $31,000 in damages and that he had incurred $3,900 in expenses and $30,000 in attorney's fees to date.

Twenty-two days after the date of the demand letter, Crayton sued Homeowners for breach of contract, violation of the TPPCA, and "Bad Faith/Deceptive Trade Practices." Homeowners answered and moved to abate the suit, claiming that Crayton had failed to provide information required under the terms of the policy and to make a written demand for an appraisal before filing suit.

The trial court entered an agreed order abating the case until an appraisal was completed and Crayton had provided the information required by the policy. Homeowners then invoked the appraisal process by writing Crayton's counsel that "[p]ursuant to the appraisal provision, Homeowners of America invokes the appraisal process and her[e]by demands appraisal to establish the amount of the loss, cost of

6

repair, and actual cash value associated with the loss." Homeowners designated an appraiser, and Crayton's counsel did the same.

Several months after the trial court had entered the abatement order, the appraisers concluded that Crayton's loss replacement cost was, before application of the deductible in Crayton's policy, approximately $13,000 and that the loss actual cash value was approximately $11,000. Homeowners made an approximately $9,000 payment to Crayton "[i]n accordance with the appraisal award." Several months after payment of the appraisal award, the parties jointly moved to lift the abatement, and the trial court entered an order doing so.

Homeowners then filed a combined no-evidence and traditional motion for summary judgment. Among other grounds, Homeowners challenged Crayton's claim that it had violated the TPPCA. Homeowners' traditional motion appears to be predicated on the ground that Crayton had not raised any basis to establish that Homeowners' original claim decision was in error. In its no-evidence motion, Homeowners challenged that it was liable on Crayton's claim because he "ha[d] failed to provide any [] evidence [that Homeowners] is liable for the claim or that it [had] failed to comply with a provision of the Prompt Payment Act chapter 542 of the Texas Insurance Code."

Crayton responded to Homeowners' summary-judgment motion, but he did not attach any controverting evidence to his response. Instead, Crayton noted recent authority from the Texas Supreme Court that the payment of an appraisal award did

not insulate an insurer from a TPPCA claim. Crayton argued that Homeowners had accepted Crayton's claim by the manner in which it had paid the appraisal award and that he was "entitled to allow a jury to determine if [Homeowners'] payment for policy benefits established that it was liable for Crayton's claim within the meaning of the [TPPCA]." Beyond this, Crayton argued that the evidence that Homeowners had attached to its summary-judgment motion created a fact issue on Homeowners' TPPCA liability—in essence, Crayton's argument was that the payment of the appraisal award demonstrated in and of itself that Homeowners' original claim decision was flawed and that it had failed to timely pay the claim. Specifically, Crayton argued that

> [a] jury is entitled to see the appraisal award, see [the adjuster's] estimate and photos, and hear testimony from the appraisers regarding the scope of damage to determine whether—based on those facts—[Homeowners] is liable for Crayton's claim. [Homeowners'] own summary[-]judgment evidence will be the majority of the evidence at trial (in addition to the appraiser's testimony). *As a result, [Homeowners'] own summary[-]judgment evidence satisfies Crayton's burden to produce a scintilla of evidence that fact issues exist. A jury should be allowed to look at the appraisal award, [Homeowners'] initial investigation, and subsequent payment to determine that [Homeowners] is liable for Crayton's claim.* [Emphasis added.]

Crayton also amended his petition to delete his claims for breach of contract and other Insurance Code violations, leaving only a cause of action under the TPPCA.[2]

---

[2]By its amendment, Crayton apparently conceded that the payment of the appraisal award barred the other claims that he had originally alleged for breach of contract and for common law and statutory bad-faith claims. *See Ortiz v. State Farm Lloyds*, 589 S.W.3d 127, 135 (Tex. 2019).

8

The trial court heard argument on Homeowners' motion for summary judgment and granted it. Crayton sought reconsideration of that ruling and a new trial, and the trial court again heard argument. The trial court denied reconsideration and a new trial by written order. Crayton then filed a notice of appeal.

### III. The TPPCA, the appraisal, and the impact of *Barbara Technologies* on the relationship of the two

#### A. We set forth what the TPPCA is.

The TPPCA establishes a number of deadlines for insurance companies to process claims and penalizes a failure to meet its deadlines by assessing interest on the claim at the rate of eighteen percent per annum and the payment of the insured's attorney's fees. *See* Tex. Ins. Code Ann. §§ 542.051–.061. The supreme court recently summarized the Act's rolling set of deadlines and its penalty provision as follows:

> Taken together, the TPPCA imposes several key requirements on insurers: (1) the insurer must acknowledge receipt of the claim, commence any investigation of the claim, and request any items, statements, or forms required from the claimant within fifteen days of its receipt of notice of the claim; (2) the insurer must notify the claimant of acceptance or rejection of the claim no later than fifteen business days after the insurer receives all items, statements, and forms required to secure final proof of loss; (3) if the insurer notifies the insured that it will pay all or part of the claim, it must pay it by the fifth business day after the date of notice of acceptance of the claim; (4) if the insurer delays payment of a claim for more than the applicable statutory period or sixty days, the insurer shall pay TPPCA damages; and (5) an insurer that is liable for a claim under an insurance policy and violates a TPPCA provision is liable for TPPCA damages in the form of 18% interest on the amount of the claim per year, with attorney's fees. *See id.* §§ 542.055(a)(1)–(3), .056(a), .057(a), .058(a), [.]060(a). Thus, the TPPCA has three main components—non-payment requirements and

9

deadlines, deadlines for paying claims, and enforcement. *See generally id.*
§§ 542.055–.060.

*Barbara Techs.*, 589 S.W.3d at 812–13. This appeal deals with the interplay of the section of the Act requiring payment within sixty days, the Act's enforcement provision, and whether that interrelation creates a fact issue that the timing of Homeowners' payment of the appraisal award violated those provisions.

## B. We set forth the appraisal process.

The appraisal process is a contractual remedy that provides a mechanism to quantify an insured's loss. *Barbara Technologies* noted that the appraisal process provides this remedy to determine the amount of the loss when the parties are at loggerheads on the issue:

> "[I]n every property damage claim, someone must determine the 'amount of loss,' as that is what the insurer must pay." [*State Farm Lloyds v.*] *Johnson*, 290 S.W.3d [886,] 895 [(Tex. 2009)]. Appraisal clauses are a means of determining the amount of loss and resolving disputes about the amount of loss for a covered claim. *Id.* at 888–89.

*Id.* at 814 (footnote omitted).

Here, Crayton's policy with Homeowners contained an appraisal provision that permitted the appointment of appraisers should the parties "fail to agree on the amount of loss." As noted, an appraisal occurred in this case, and Homeowners paid Crayton for the loss as determined by the appraisers.

10

**C.** **We explain the interplay of the TPPCA and the appraisal process described by the analysis of *Barbara Technologies*.**

It was almost accepted wisdom of the courts of appeals that an insurer's payment of an appraisal award insulated the insurer from TPPCA claims. The supreme court's opinion in *Barbara Technologies* worked a sea change in that view.

The supreme court noted that the appraisal process was in common use long before the passage of the TPPCA but that the Act makes no reference to it. *Id.* The failure of the Act to mention such a long-used process prompted the court to conclude that it "must interpret the absence of any such language in [C]hapter 542 to mean that the Legislature intends neither to impose specific deadlines for the contractual appraisal process within the TPPCA scheme nor to exempt the contractual appraisal process from the deadlines provided by the [Act]." *Id.*

After concluding that the TPPCA's text does not integrate the appraisal process into its deadlines, *Barbara Technologies* "examine[d] the TPPCA's deadline and enforcement provisions to determine how they apply in the context of contractual appraisals." *Id.* at 817. As detailed below, the supreme court appears to place the appraisal process in a separate lane from TPPCA claims, with the appraisal process neither being a liability trigger under the TPPCA nor a defense to liability under that Act.

The supreme court described the end game of the TPPCA process as an investigation and evaluation by the insurer that

11

culminate[s] in a determination either that the claim is covered and the amount of loss exceeds the deductible, in which case the insurer must notify the insured that it will pay the claim, or that the claim is rejected, in which case the insured must notify the insured of the reasons—for example, because the loss is not covered, the amount of the loss does not meet the deductible, or for some other reason under the policy.

*Id.* "Accepting" the claim triggers the deadline for payment within five business days. *See* Tex. Ins. Code Ann. § 542.057(a).

But rejection, which from the supreme court's description includes the determination that a covered loss falls below a policy's deductible, triggers none of the Act's deadlines and, for that reason, could not trigger the Act's enforcement provision that requires a determination that the insurer is liable under the policy *and* has failed to comply with some requirement of the Act. *See Barbara Techs.*, 589 S.W.3d at 819–20 (interpreting Tex. Ins. Code Ann. § 542.060). Specifically,

[w]hen an insurer rejects a claim in accordance with [S]ections 542.055 and [542].056 and notifies the insured of the reasons for the rejection, no other TPPCA deadlines or requirements apply at that point that could give rise to a claim under [S]ection 542.060, as there is no payment deadline without the insurer[’s] owing benefits under the policy.

*Id.* at 817. Thus, the court concluded that "[u]nder the TPPCA, use of the appraisal process to resolve a dispute has *no bearing* on any deadlines or enforcing any missed deadlines." *Id.* at 817–18 (emphasis added).

The supreme court then dealt with the case law that had previously overlaid the appraisal process onto TPPCA claims and rejected the holding that the "full and timely payment of an appraisal award precludes an insured from recovering damages

12

under the TPPCA as a matter of law." *Id.* at 818. *Barbara Technologies* viewed the cases as lacking in statutory analysis but accepted their premise to the extent that "use of the appraisal process to fully resolve a dispute as to the amount of policy benefits due, if owed at all, does not subject the insurer to TPPCA damages." *Id.* at 819.

Then, *Barbara Technologies* appears to take the step of placing the appraisal process into a separate lane from the TPPCA and, with that demarcation in place, to hold that the payment of an appraisal award neither creates nor forestalls liability under the TPPCA's enforcement provision found in Section 542.060 of the Act:

> While we address the standard for TPPCA damages under [S]ection 542.060 below, we caution that to the extent these opinions could be read to excuse an insurer liable under the policy from having to pay TPPCA damages merely because it tendered payment based on an appraisal award, or to foreclose any further proceedings to determine the insurer's liability under the policy, we disapprove of these opinions. *See* Tex. Ins. Code [Ann.] §§ 542.058, .060. Nothing in the TPPCA would excuse an insurer from liability for TPPCA damages if it was liable under the terms of the policy but delayed payment beyond the applicable statutory deadline, regardless of use of the appraisal process.

*Id.*

The supreme court then turned to a further analysis of Section 542.060. In this analysis, *Barbara Technologies* appeared to follow the same analytical approach that it had taken in dealing with the interrelation of the Act and appraisals; the mandates of the Act and the fact that an appraisal has occurred are discreet events, with the appraisal not acting as a trigger for TPPCA liability.

Initially, the supreme court quoted Section 542.060(a)'s language that "[e]xcept as [otherwise] provided . . . , if an insurer that is *liable* for a claim under an insurance policy is not in compliance with this subchapter, the insurer is liable to pay" the insured damages as specified by this section. *Id.* (quoting Tex. Ins. Code Ann. § 542.060(a)). The supreme court explained that Section 542.060(a) contains two triggers to the imposition of its penalties:

> We see no way under the language of the TPPCA that an insurer can be "liable" on the claim within the meaning of [S]ection 542.060 until it (1) has completed its investigation, evaluated the claim, and come to a determination to accept and pay the claim or some part of it; or (2) [has] been adjudicated liable by a court or arbitration panel.

*Id.*

When an insurer rejects a claim, the insurer can only become liable under Section 542.060 if it later accepts the claim or is adjudged to have wrongfully rejected the claim. *Id.* at 819–20. Specifically, the supreme court held that

> [i]f an insurer rejects a claim, it has concluded based on its investigation and evaluation that it owes no benefits under the policy and is not liable for the claim; *unless and until the insurer later accepts the claim, thereby admitting liability, or there is a judgment that the insurer wrongfully rejected the claim, the insurer is not "liable for a claim under an insurance policy" under [S]ection 542.060.*

*Id.* (emphasis added).

The supreme court then described when the appraisal process might trigger the liability element of Section 542.060 even though the insurer had initially rejected the claim in such a way that it had not initially triggered liability under the Act. *Id.* at 820. In this analysis, *Barbara Technologies* first described the appraisal process as an

14

expression of an insurer's willingness "to resolve a dispute outside of court" and likened it to a settlement. *Id.* With that premise in place, the supreme court held that the payment of the appraisal did not trigger the conditions of liability found in Section 542.060 because they were neither "an acknowledgment of liability nor a determination of liability under the policy." *Id.*

After analyzing several additional cases, the supreme court again reiterated the gulf that exists between what is necessary to establish an insurer's liability under the TPPCA and the effect of the payment of an appraisal award:

> *To be clear, nothing in the TPPCA suggests that the invocation of a contractual appraisal provision alters or suspends any TPPCA requirements or deadlines. Rather, under the TPPCA, until an insurer is determined to owe the claimant benefits and thus is liable under the policy—either by accepting the claim and notifying the insured that it will pay, or through an adjudication of liability—the insurer is required to pay nothing, is subject to no payment deadline, and is not subject to TPPCA damages for delayed payment.* See Tex. Ins. Code [Ann.] § 542.060(a) (imposing prompt pay damages when an insurer is liable under the policy and violated a provision of the TPPCA). This is not to say that a rejected claim can never trigger damages under the TPPCA; to the contrary, if an insurer later accepts a claim after initially rejecting it, or if an insurer is adjudicated liable for a claim it rejected, TPPCA deadlines and prompt pay requirements will apply. *See id.* §§ 542.057–.060. *But use of a policy's appraisal process to resolve a dispute as to the value of loss—that is, the amount of benefits the insured would be entitled to under the policy if the insurer were determined liable for the claim—and payment based on the appraisal has no bearing on the TPPCA's payment deadlines or enforcement of those deadlines. See In re Allstate Cty. Mut. Ins. Co.*, 85 S.W.3d [193,] 198 [(Tex. 2002) (orig. proceeding) (Baker, J., dissenting)] (citation omitted).

> Here, [the insured] filed suit after [the insurer] investigated, evaluated, and ultimately rejected the claim. The parties' insurance policy sets forth the parameters of the appraisal process, providing the parties an alternative to seeking a judgment to resolve a dispute as to the value of the claim. [The insurer] invoked the appraisal provision because

15

[the insured] disputed the insurer's determination that the amount of the loss was below [the insured's] deductible, which resulted in rejection of the claim. *At that point, the parties were already in litigation, and the appraisal provision offered an alternative process to resolve the valuation dispute. While the TPPCA does not acknowledge the appraisal process—neither explicitly subjecting it to the TPPCA's deadlines or enforcement, nor exempting it—[C]hapter 542 establishes that an insurer is not subject to TPPCA damages for delayed payment unless it was subject to a payment deadline because it owed benefits under the policy. We hold that [the insurer's] payment of the appraisal value neither established liability under the policy nor foreclosed TPPCA damages under [S]ection 542.060.*

*Id.* at 822–23 (footnotes omitted) (emphases added); *see also Ortiz*, 589 S.W.3d at 132 ("As explained, appraisal awards do not serve to establish a party's liability (or lack thereof). *In re Allstate* [*Cty. Mut.*] *Ins. Co.*, 85 S.W.3d at 195. Rather, they contractually resolve a particular type of dispute among insurers and insureds: the amount of the covered loss. *Id.*").

It appears to us that *Barbara Technologies* left open avenues for the insured to show that TPPCA deadlines were triggered because the insurer was liable on its policy at the time that it rejected the claim but removed the appraisal process's probative value in making that showing.

### D. The meaning of Section 542.058 was left unanswered by the majority opinion in *Barbara Technologies*.

*Barbara Technologies* gave guidance on the question of whether an insurer who rejects a claim is liable under Section 542.060 but did not address whether that insurer might be liable under the provision of the Act that provides an overall deadline for when a claim should be paid. Specifically, the supreme court left unanswered how to interpret Section 542.058 of the TPPCA:

16

> Except as otherwise provided, if an insurer, after receiving all items, statements, and forms reasonably requested and required under Section 542.055, delays payment of the claim for a period exceeding the period specified by other applicable statutes or, if other statutes do not specify a period, for more than 60 days, the insurer shall pay damages and other items as provided by Section 542.060.

Tex. Ins. Code Ann. § 542.058(a). *Barbara Technologies* also offered no guidance to interpret Subsection (b) of Section 542.058 that provides, "Subsection (a) does not apply in a case in which it is found as a result of arbitration or litigation that a claim received by an insurer is invalid and should not be paid by the insurer." *Id.* § 542.058(b).

Because the parties in *Barbara Technologies* had not addressed the question of Section 542.058's interpretation, the supreme court only outlined but did not reconcile the tension between the language of Section 542.058 and that of Section 542.060:

> Neither party has specifically raised the issue of whether [S]ection 542.058's "shall pay damages" language could be the basis for TPPCA damages for late payment, independent of [S]ection 542.060's limitation of TPPCA damages to insurers "liable on a claim under an insurance policy." Moreover, the parties have not briefed the interplay between [S]ection 542.060's liability requirement and [S]ection 542.058's exception for a claim that is found to be "invalid" and "should not be paid."

*Barbara Techs.*, 589 S.W.3d at 824.

The only interpretative hint that the majority opinion in *Barbara Technologies* offered as to the meaning of Section 542.058 was "that when discussing the damages standard under the TPPCA and its predecessor, this Court has recognized the liability element for imposing TPPCA damages." *Id.*

**E.     We set forth how *Barbara Technologies* summarized its holdings.**

17

The supreme court wrapped up its discussion of the TPPCA by concluding that

> [u]nder the TPPCA, an insurer must pay damages in the form of 18% interest on the amount of the claim and reasonable and necessary attorney's fees if it delays payment of a claim for more than the applicable statutory period or sixty days. *See* Tex. Ins. Code [Ann.] §§ 542.058, .060. We hold that neither [the insurer's] invocation of the policy's appraisal process for resolution of a dispute as to the amount of loss, nor [the insurer's] payment based on the appraisal amount, exempts [the insurer] from TPPCA damages as a matter of law. And without [the insurer] having accepted liability under the policy or having been adjudicated liable, we hold that [the insured] is not entitled to TPPCA damages as a matter of law. We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

*Id.* at 828–29.

### F. The concurrence in *Barbara Technologies* analyzed Section 542.058 and concluded that the insurer had violated this TPPCA section by rejecting the insured's claim and then subsequently paying the appraisal award.

The concurrence did not shy away from interpreting Section 542.058 and came to the conclusion that it dictated liability for the insurer in the circumstances analyzed by *Barbara Technologies*. The concurrence "conclude[d] that, by voluntarily and unconditionally paying the benefits claimed, the insurer conceded both its liability and the claim's validity." *Id.* at 829 (Boyd, J., concurring & dissenting). Thus, the concurrence concluded that the case should be remanded to the trial court to address only the amount of interest and attorney's fees that the insurer owed the insured. *Id.*

The concurrence outlined the TPPCA's flow and initially noted that the sections dealing with the claim's acknowledgement, acceptance, and payment "impose

18

no payment obligation or deadline when the insurer *rejects* a claim for policy benefits." *Id.* at 831 (discussing Tex. Ins. Code Ann. §§ 542.055–.057). On the other side of the equation, when the insurer accepts the claim, "the Act requires it to pay the claim within five business days." *Id.*

In the concurrence's view, the TPPCA "describes two *independent* circumstances in which insurers must pay statutory interest and attorney's fees." *Id.* (emphasis added). The two independent circumstances are found in Sections 542.058 and 542.060:

> •*First*, if an insurer "delays payment of the claim" for more than sixty days after it receives all reasonably required "items, statements, and forms" from the claimant, it "shall" pay interest and attorney's fees "as provided by Section 542.060," unless "it is found as a result of arbitration or litigation" that the claim "is invalid and should not be paid." [Tex. Ins. Code Ann.] § 542.058(a), (b).
>
> •*Second*, if an insurer "is liable for a claim under an insurance policy" and "is not in compliance with" the Act, it must pay, "in addition to the amount of the claim, interest on the amount of the claim at the rate of 18 percent a year as damages, together with reasonable and necessary attorney's fees." *Id.* § 542.060(a).

*Id.* at 831–32 (footnotes omitted).

After analyzing and rejecting the rationales of the various cases holding that "an insurer that makes a full and timely payment of an appraisal award is not obligated to pay statutory interest or attorney's fees even if it previously failed to comply with the Act or timely pay the claim," the concurrence concluded that the appraisal process performed a different function than the TPPCA. *Id.* at 834, 837 (footnote omitted).

19

Appraisal provides a mechanism to value the claim but does not establish when the insurer should have paid the claim; instead, the TPPCA dictated when the claim should be paid. *Id.* at 837.

By separating the TPPCA and the appraisal process into separate spheres that removed the appraisal process from the equation used in determining a violation of the TPPCA, the concurrence began to unravel the answer to its initial question regarding whether the TPPCA required the insurer to pay interest and attorney's fees after "having voluntarily and unconditionally paid the claim for benefits, but having paid more than sixty days after receiving all the information it required before rejecting the claim." *Id.* In the concurrence's view, the insurer had complied with the Act by acting timely in processing and rejecting the claim up until it faced the sixty-day deadline for payment in Section 542.058. *Id.* The insurer, however, violated Section 542.058 because its later voluntary payment of the appraisal award was made "more than sixty days after it received all the information it reasonably required from [the insured] to decide to reject the claim." *Id.* By paying the appraisal award long after rejecting the claim, the insurer transgressed the sixty-day time limit for payment in Section 542.058(a), and the insurer had not been freed from the effect of its violation by obtaining a finding under Section 542.058(b) that "as a result of arbitration or litigation that a claim received by an insurer is invalid and should not be paid by the insurer." *Id.*

The concurrence then took up the task that the majority in *Barbara Technologies* abjured and offered guidance to the trial court on why it should determine on remand that Section 542.060 does not apply to the facts found in the case but that Section 542.058 does and why the facts establish a violation of that section. *Id.* at 837–39.

It appears that the concurrence concluded that a violation occurred in large part because of the effect of Section 542.058(b)'s language that the sixty-day deadline does not apply if there is a finding that the claim is invalid. *Id.* at 839 (citing Tex. Ins. Code Ann. § 542.058(a), (b)). That provision largely underlies the three reasons for the concurrence's view that the insurer had violated Section 542.058 through its failure to comply with the section's sixty-day deadline:

First, the concurrence challenged the majority's instruction that the trial court on remand should apply both Sections 542.058 and 542.060 by reading them together. *Id.* at 838. In the concurrence's view, that exercise was impossible because Sections 542.058 and 542.060 create opposite burdens on the same issue, trigger different deadlines, and require the payment of the Act's penalties under different circumstances. *Id.* The concurrence's view was that when an insurer accepts a claim, the deadline to pay the claim in five days under Section 542.057 is triggered, and thus Section 542.058's sixty-day deadline never becomes applicable. *Id.* at 839. On the other hand, when an insurer rejects a claim but complies with the TPPCA's deadlines while doing so, there is no claim that the insurer has failed to comply with the

21

TPPCA, and thus the predicate of liability under Section 542.060 that the insurer is not in compliance with the Act is not met. *Id.*

Not only did the structure of the TPPCA create an "irreconcilable conflict" when attempting to apply the two sections, that structure created a similar conflict if claims under both sections were submitted to a jury. *Id.* at 838. The concurrence viewed the invalidity language in Section 542.058(b) that freed the insurer from that section's sixty-day deadline as being the same standard as Section 542.060's standard that required a finding that the insurer "is liable." *Id.* With that premise established, the concurrence thought it impossible to follow the majority's instructions that on remand the insured must prove that the insurer was liable under its policy *and* that the insurer could challenge the assertion of liability by proving that it had no liability because the claim was invalid. *Id.* As the concurrence stated, the majority "would place the burden entirely on [the insured]—requiring [the insured] to prove that its claim for policy benefits was 'valid' and should have been paid because [the insurer] was 'liable' on the claim—[and would] render[] [S]ection .058(b) completely meaningless." *Id.*

The concurrence then explained why it had concluded that Section 542.058 applied when the insured rejected a claim but later paid it after the appraisal process. *Id.* at 839. Again, the insurer had complied with Section 542.060 because it had "timely acknowledged, investigated, and rejected [the insured's] claim and [had] provided the reasons for its rejection." *Id.* And again accepting the claim did not

22

create liability under the sixty-day deadline of Section 542.058 because the five-day deadline to pay an accepted claim under Section 542.057 controlled, and the failure to meet that deadline would trigger a violation of Section 542.060 because the insurer would not be "in compliance with" the Act. *Id.*

But Section 542.058 fit the crime of initially rejecting the claim but then paying an appraisal award. *Id.* The failure to pay the claim until there was an appraisal award showed that the insurer had violated Section 542.058 because it had "'delayed payment of the claim' for more than sixty days after receiving from [the insured] all the information it required to secure proof of loss" and had not carried its burden of proof under Section 542.058(b) that the insured's claim was invalid and should not have been paid. *Id.*

The concurrence then argued that the invalidity provision of Section 542.058 would still apply even if Section 542.060 could be read to apply to the facts involved in *Barbara Technologies*. *Id.* Even if Section 542.060 applied, the concurrence concluded that the insurer would still be required "to pay the statutory interest and attorney's fees unless the insurer [met] its burden to prove that the claim was invalid and should not have been paid. Section [542].060 applies only if [the insurer] was 'not in compliance with' the Act." *Id.* The concurrence's chain of reasoning was that if the insurer complied with the TPPCA in how it acknowledged, investigated, and rejected the claim, the insurer's only potential act that would meet the liability standard of Section 542.060 for "not [being] in compliance with" the TPPCA would

be the failure to pay within Section 542.058's sixty-day deadline. As the act of noncompliance was found in Section 542.058 then apparently all the provisions of that section must control, including its provision that requires the insurer to pay unless it carries its burden to establish the claim was invalid and should not have been paid. *Id.*

After detailing its views regarding why Section 542.058 applied, the concurrence then set out its view that "the Act's language confirms that an insurer that voluntarily and unconditionally pays a claim 'is liable' on that claim, even if its liability has not been adjudicated." *Id.* at 840–41. The concurrence rejected the majority's construction that Section 542.060 requires an adjudication of the insurer's liability. *Id.* at 841. The concurrence viewed the Act as not requiring an adjudication of liability before Section 542.060 applies but requiring only an adjudication of invalidity to free an insurer from the deadline of Section 542.058 and drew from this inconsistency a presumption that the provisions carried different meanings. *Id.*

Then, Justice Boyd turned back to an argument based on the invalidity language of Section 542.058(b) and his construction of that section to mean that an insurer carries the burden to prove that it is not liable on the claim. *Id.* at 842–43. He reiterated that to require an adjudication that an insurer is liable before the sixty-day deadline applies would render meaningless Section 542.058(b) because that subsection requires the insurer to prove that the claim is invalid and thus places the burden on the insurer to establish that it is not liable before being freed from the sixty-day deadline. *Id.* at 842. He also reiterated the principle that he had stated earlier in his

opinion that the contradiction takes shape because if "[a]ll that matters then is whether the insurer is legally adjudicated to be liable, [] whether it is found to be *not* liable is irrelevant and [S]ubsection .058(b) is completely meaningless." *Id.*

Next, the concurrence disagreed with the majority that payment of the appraisal did not constitute an acceptance of the claim. *See id.* Unlike the majority, the concurrence saw no difference between "(1) an insurer who initially accepts and pays the claim, (2) an insurer who initially rejects but later voluntarily and unconditionally pays a claim, and (3) an insurer who initially rejects but later voluntarily and unconditionally pays the claim in an amount determined through an appraisal process." *Id.* In the concurrence's view, none of the three scenarios altered the fact that "by voluntarily and unconditionally paying the claim, the insurer 'accepts' the claim and thus concedes its liability for the benefits under the policy." *Id.* at 843. The effect of that concession was not lessened because the amount of the loss was determined by the appraisal process. *Id.* To avoid making a concession of liability, the insurer could have continued to reject the claim. *Id.* "Instead, [the insurer] voluntarily and unconditionally paid the claim" and could no longer "argue that the claim it ha[d] voluntarily and unconditionally paid should not have been paid at all." *Id.*

After charting the path outlined above, the concurrence summarized its views as follows:

> In summary, [the insurer] timely acknowledged, investigated, and rejected [the insured's] claim just as the Act required. Unsatisfied with [the insurer's] decision, [the insured] filed suit, forcing [the insurer] to

25

either voluntarily pay the claim or litigate its liability and the claim's validity. [The insurer] chose to voluntarily and unconditionally pay the claim but did so more than sixty days after receiving from [the insured] all the information it reasonably required to initially reject the claim. Because [the insurer] fully complied with the Act's requirements, [S]ection .060 and its "is liable" standard does not apply. Instead, [S]ection .058 applies, and because arbitration or litigation has never determined that [the insured's] claim was invalid and should not have been paid, [S]ection .058 requires [the insurer] to pay statutory interest and attorney's fees. And even if [S]ection .060 could also somehow apply, it requires [the insurer] to pay interest and fees because [the insurer] conceded that it "is liable" under the policy by voluntarily and unconditionally paying the claim.

*Id.*

## IV. Standard of review

We apply a de novo standard of review to summary judgments. *Travelers Ins. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). A no-evidence motion for summary judgment is reviewed "under the same legal sufficiency standard as a directed verdict." *Painter v. Ameritex Drilling I, Ltd.*, 561 S.W.3d 125, 130 (Tex. 2018). That standard places the burden on the nonmovant "to produce more than a scintilla of evidence to support each challenged element of its claims." *Id.*

The party moving for a traditional summary judgment carries "the burden to prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Ortiz*, 589 S.W.3d at 131. "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Id.* (quoting *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005)).

26

We recently noted how we organize our review of combined no-evidence and traditional summary-judgment motions as follows:

> Because the trial court did not state the grounds for granting summary judgment, we will uphold the summary judgment if it can be sustained under either traditional or no-evidence grounds. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). When a party moves for summary judgment under both traditional and no-evidence grounds, we normally first review the trial court's judgment under the no-evidence grounds. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). But we may address the traditional grounds for summary judgment first when they are dispositive. *See D.R. Horton-Tex., Ltd. v. Savannah Props. Assocs., L.P.*, 416 S.W.3d 217, 225 n.7 (Tex. App—Fort Worth 2013, no pet.) (addressing traditional summary judgment first because movant's affirmative defense was dispositive).

*Tippett v. Safeco Ins. Co. of Ind.*, No. 02-19-00152-CV, 2020 WL 827143, at *3 (Tex. App.—Fort Worth Feb. 20, 2020, no pet.) (mem. op.).

## V. Why we conclude that the trial court properly granted Homeowners' motion for summary judgment

As we previewed in the introduction, we conclude that the trial court made the proper determination by granting Homeowners' no-evidence motion for summary judgment. Homeowners did not accept Crayton's claim by the manner in which it paid the appraisal award, a disparity between the original adjustment and the appraisal award is not probative of Homeowners' liability under the rationale of *Barbara Technologies*, and Homeowners did not violate Section 542.058 of the Act.

### A. Homeowners did not "accept" Crayton's claim when it paid the appraisal award.

Crayton argues that there is evidence that Homeowners indeed accepted that it was liable on his claim, and because it was not in compliance with the provisions of the TPPCA, it was liable under Section 542.060(a). By this argument, Crayton tries to place Homeowners in the category established by *Barbara Technologies* of an insurer becoming liable even though it had initially rejected a claim because it subsequently accepted the claim. *See Barbara Techs.*, 589 S.W.3d at 822 n.12 (majority opinion). We disagree that Homeowners' actions constituted "acceptance" of the claim under the standard pronounced by *Barbara Technologies*.

The supreme court outlined when an insurer might admit its way into liability for a claim previously rejected:

> Even after acknowledging receipt of the claim, investigating it, and then rejecting the claim (that is, denying liability), an insurer may later choose to accept the claim, admitting liability under the policy. For example, if a contractual appraisal provision such as the one in this case is invoked after the insurer has received all information requested from the claimant, conducted an investigation, and rejected the claim, the insurer may choose to[] (1) refuse to pay the appraisal amount and maintain its denial of liability for the claim; (2) pay the appraisal amount without accepting liability; or (3) *accept the claim, essentially admitting it was incorrect to deny liability initially, and then pay the claim in accordance with the appraisal amount. If the insurer chooses the third option, it becomes liable for the claim despite its earlier rejection of the claim, and it will be subject to TPPCA damages for failure to pay within the applicable TPPCA deadlines. See* Tex. Ins. Code [Ann.] §§ 542.056(a), .057(a), .058, .060. If the insurer chooses the first option, refusing to pay an appraisal amount and continuing to deny liability, the insured could choose to pursue litigation. And if the litigation resulted in a judgment that the insurer was in fact liable on the claim, the insurer would then owe the amount of the claim, as fixed by the binding appraisal, and TPPCA damages if the insurer failed to pay the claim timely in accordance with [S]ection 542.058. *See id.* §§ 542.058, .060.

> This opinion addresses only the second option, as those are the facts of the case before us.

*Id.* (emphasis added).

Thus, the question is how an insurer places itself in the ambit of the third option by accepting the claim in a way that essentially admits itself into liability. Based on a subsequent footnote in *Barbara Technologies*, it appears that the insurer must "specifically accept" the claim:

> JUSTICE BOYD [in the concurrence] would hold that voluntarily paying the appraisal amount constitutes acceptance of the claim. *See post* at 829. We disagree. An appraisal is binding only as to the amount of the loss on the claim, not as to liability. *See, e.g., In re Allstate Cty. Mut. Ins.*, 85 S.W.3d at 198 (explaining that an appraisal is not used to determine liability (citation omitted)); *Breshears*[ *v. State Farm Lloyds*], 155 S.W.3d [340,] 343 [(Tex. App.—Corpus Christi–Edinburg 2004, pet. denied) (mem. op.).] *So an insurer that pays an appraisal amount as to a rejected claim—where the insurer has denied liability—does not satisfy* [S]*ection 542.060's requirement that the insurer be "liable for a claim under an insurance policy,"* **unless the insurer specifically accepts the claim or is adjudicated liable.** *See* Tex. Ins. Code [Ann.] § 542.060(a). We find no support for the proposition that payment of an appraisal amount on a rejected claim establishes liability for purposes of [S]ection 542.060.

*Id.* at 823 n.14 (emphasis added).

Here, Crayton argues that Homeowners did not qualify its language carefully enough when it paid the appraisal award and stepped into a retrospective acceptance of the claim. In his view, various statements should be construed as admissions that Homeowners was liable under the policy:

> While payment of an appraisal award is not in and of itself an acceptance of the insured's claim, in this case, at least *some* evidence of acceptance exists. For example, [Homeowners'] payment letter reflects that

[Homeowners] paid $9,190.22 on October 19, 2018, "covering [replacement cost value] on the dwelling, [replacement cost value] on other structures that are buildings and the [actual cash value] on the fence." The letter further explains that the appraisal award payment "established compliance with its obligations under the policy" and was timely paid "under the policy." Likewise, the check detailing [Homeowners'] payment of the appraisal award is evidence of acceptance. The check stub identifies the payment as one made on Crayton's 2014 claim, pursuant to the policy, under "Coverage A Dwelling" for "property damage" out of [Homeowners'] "Claims Account." [Record citations omitted.]

The evidence that Crayton cites does not create a specific acceptance of the claim. Here, Homeowners invoked the appraisal process and then paid the amount of the appraisal award; the very first words of the letter state that the basis of its payment is "[i]n accordance with the appraisal award." The reference to compliance with the policy and timely payment is reasonably interpreted as a reference to the fact that Homeowners had complied with the appraisal provision of its policy and not as an admission that it had indeed been liable all along. The evidence cited by Crayton does not show that Homeowners specifically accepted the claim in a way that essentially admitted it was incorrect to deny liability initially and then pay the claim in accordance with the appraisal amount.

A federal court rejected an argument similar to Crayton's in *Lopez v. Allstate Texas Lloyds*, No. 7:18-CV-260, 2020 WL 292342, at *9–11 (S.D. Tex. Jan. 21, 2020) (opinion & order). In *Lopez*, the insured relied on five examples of language that he argued showed that an insurer had accepted his claim by paying an appraisal award. *Id.* at *10. The instances that the insured relied on were similar to those relied on by

30

Crayton to support his contention that Homeowners specifically accepted the claim; the instances in *Lopez* included

> language found in Defendant's February 7, 2019 letter and motions, that Defendant "admitted:" (1) the appraisal payment was "an unconditional payment for 'the Full Cost or Replacement less deductible;'" (2) Defendant "tendered payment of the 'full net Replacement Cost Value;'" (3) the payment "was in compliance with the 'Loss Payment' provision in the policy;" and twice (4) "[Plaintiff] had received 'the full extent of all recoverable benefits under the subject Policy.[']"

*Id.* *Lopez* rejected the contention that the examples relied on by the insured were admissions of liability and acceptance that the claim was covered. *Id.* at *11. Rather the "statements that payment was made pursuant to the appraisal award and the appraisal award was timely paid pursuant to the policy . . . does nothing more than detail the contractually required payment made by [the insurer] after the appraisal process." *Id.* The references that Crayton relies on do no more than those relied on by the insured in *Lopez* and did not constitute a specific acceptance by Homeowners of Crayton's claim.

### B. The fact that the appraisal award was made did not meet Crayton's burden to present a scintilla of evidence of a TPPCA violation.

Next, without telling us whether he seeks to establish a violation of Section 542.058 or Section 542.060, Crayton argues that "there is some evidence to support the adjudication of [Homeowners'] liability for [his] claim." The evidence that Crayton cites is that the appraiser and Homeowners never disputed that his claim was a covered loss and that his claim was rejected because the amount to repair the

31

damages fell below his deductible. Then he points out that the appraisal award was five times the original estimate of damages. With that combination of evidence, he argues that

> [a]t trial, a jury will review the award and payment letter as well as [the adjuster's] loss report, estimate, and photos. This amounts to more than a scintilla of evidence that Crayton suffered a covered loss (which [Homeowners] has never disputed) and that the cost of repair was more than his $3,020 deductible. A reasonable jury could certainly conclude from these items that [Homeowners] is liable for Crayton's claim under the policy.

This comparison of the original adjustment against the appraisal award, Crayton argues, is exactly what *Barbara Technologies* contemplates and was the basis for *Barbara Technologies'* conclusion that the insured did not establish a right to relief as a matter of law. We conclude to the contrary; using the appraisal results as evidence that the insurer is liable contravenes the rationale of *Barbara Technologies* that places TPPCA deadlines and the appraisal process in separate realms.

We will first deal with whether the fact that the appraisal is higher than the amount of damages found in the original adjustment creates a fact issue regarding whether the insurer "is liable" under Section 542.060's standard. We read *Barbara Technologies* as contrary to Crayton's argument that comparisons of the original adjustment to the appraisal award is what that opinion contemplates. Instead, we view *Barbara Technologies* as being antithetical to such an approach. As we have outlined, *Barbara Technologies* goes on at length divorcing the appraisal process from the determination that the insurer is liable on the policy and thus liable under the

32

TPPCA. Crayton never explains how he can create a comparator using the appraisal award and the original adjustment when *Barbara Technologies* holds that the

> use of a policy's appraisal process to resolve a dispute as to the value of loss—that is, the amount of benefits the insured would be entitled to under the policy if the insurer were determined liable for the claim—and payment based on the appraisal *has no bearing* on the TPPCA's payment deadlines or enforcement of those deadlines.

589 S.W.3d at 822 (emphasis added).[3] Indeed, the supreme court has likened the appraisal process as akin to a settlement. *Id.* at 820. The logical force of placing the TPPCA liability and appraisal in what we describe as separate lanes is that an insured can certainly prove that the insurer is liable on its policy and should have paid the claim earlier, but he must remove the appraisal as being probative on those issues.

In essence, Crayton wants to find a back door into the use of an appraisal award when the supreme court appears to have shut the front door. If that door were opened, the process that the supreme court views as the vital process of appraisal could, for all practical purposes, be at an end. An insurer would know that once it invokes appraisal, it runs the risk of producing a result that, rather than helping end litigation, would provide the ammunition for the litigation to continue and places itself at a severe disadvantage when arguing that it was not liable on its policy. The insurer would be left in the position of trying to explain the arcana of the appraisal process to the jury

---

[3]The supreme court references "enforcement" while discussing Section 542.060(a), which predicates the ability to enforce its penalties on the insurer's being "liable for a claim." *See* Tex. Ins. Code Ann. § 542.060(a). By stating that the appraisal has no bearing on "enforcement," this augments our conclusion that the appraisal process has no bearing on establishing liability.

33

as justification for its determination not to pay the claim in the first place when purportedly disinterested appraisers came up with a higher number.

Crayton argues that by holding as we do, we violate *Barbara Technologies'* holding that the insurer did not "demonstrate[] that TPPCA damages are foreclosed as a matter of law, as tender of the appraisal amount does not preclude TPPCA damages." 589 S.W.3d at 828. We agree with Crayton that the supreme court held that the payment of the appraisal award did not free the insurer from a remand of the case. But *Barbara Technologies* was an introduction to a new world exploring the interrelation of the TPPCA and appraisals. Because of Homeowners' and Crayton's arguments and the state of the summary-judgment record, we face an issue not explicitly answered by *Barbara Technologies*: is the appraisal award probative evidence that the insured is liable for the claim and should have paid the claim in accordance with TPPCA's deadlines? We apply what we see as the rationale of *Barbara Technologies* to answer the question in the negative.[4] In doing so, our interpretation avoids the

---

[4]Crayton also points to other cases in which the supreme court and this court have remanded cases after *Barbara Technologies* was handed down and argues that we should follow a similar course. Those cases, however, did not involve the issues we grapple with here. *See Lazos v. State Farm Lloyds*, 601 S.W.3d 783, 784 (Tex. 2020) (remanding case to trial court to apply *Barbara Technologies* and *Ortiz* when court of appeals had concluded that the insured "could not maintain his TPPCA claim due to [the insurer's] payment of the appraisal award"); *Alvarez v. State Farm Lloyds*, 601 S.W.3d 781, 783 (Tex. 2020) (same); *Lambert v. State Farm Lloyds*, No. 02-17-00374-CV, 2019 WL 5792812, at *3 (Tex. App.—Fort Worth Nov. 7, 2019, pet. filed) (mem. op.) (remanding case because it was in the same procedural posture as *Barbara Technologies*); *see also Perry v. United Servs. Auto. Ass'n*, 602 S.W.3d 915, 917 (Tex. 2020) (same); *Marchbanks v. Liberty Ins. Corp.*, 602 S.W.3d 917, 918 (Tex. 2020); *Alcala v.*

concerns that Chief Justice Hecht noted in his dissent about the seeming contradictions of the majority's reasoning.[5]

### C. The evidence does not raise a fact issue that Homeowners violated Section 542.058 of the TPPCA.

#### 1. We set forth the basic points that show why we disagree with the concurrence.

Crayton next invokes Section 542.058 to argue that we should reverse the granting of Homeowners' no-evidence summary judgment. He uses Section 542.058 in two ways. First, he argues that paying the appraisal award more than 1,000 days after rejecting his claims is a violation of the sixty-day limit of Section 542.058 and was thus not in compliance with the TPPCA and thus constituted a violation of Section 542.060. He then argues that Homeowners committed the following freestanding violation of Section 542.058:

> Section 542.058 lacks the liability element present in Section 542.060. It is undisputed that [Homeowners] had everything it needed to make a

---

*Republic Lloyds*, No. 13-18-00026-CV, 2020 WL 830840, at *4 (Tex. App.—Corpus Christi–Edinburg Feb. 20, 2020, no pet.) (mem. op.) (reversing summary judgment predicated on timely payment of appraisal award).

[5]Chief Justice Hecht noted the seeming contradiction in the majority's approach as follows:

> I think this is a fair paraphrase: the crux of the courts' opinions is that the Act does not penalize a postclaim-rejection payment of an appraisal award, and we do not disagree with that; but the Act does not excuse a postclaim-rejection payment of an appraisal award from its penalties, so we disapprove of them.

*Barbara Techs.*, 589 S.W.3d at 849 (Hecht, C.J., dissenting).

claim decision on October 15, 2014, but did not pay the appraisal award until 1,464 days later. Accordingly, even assuming *arguendo* that Crayton lacked sufficient evidence of liability, his TPPCA claim still should have survived no-evidence summary judgment because there is more than a scintilla of evidence that [Homeowners] violated Section 542.058.

We now enter the territory left uncharted by the majority opinion in *Barbara Technologies*, which is the construction of Section 542.058. This creates the task of weaving together the few comments that the majority in *Barbara Technologies* made about Section 542.058, the extensive commentary about that section in the concurrence, and our own view of the section's meaning in order to interpret the section's impact on Crayton's TPPCA claim. It is our conclusion that Homeowners' actions were not a violation of Section 542.058.

We must disagree with the concurrence that the circumstances of this case, which mimic those of *Barbara Technologies*, establish a violation of Section 542.058 for which the insurer commits what is tantamount to a per se violation of Section 542.058(a). First, comparing Justice Boyd's opinion and the majority's, it appears that the majority does not agree with the premises that the concurrence uses to argue that there could be no violation of Section 542.060 and there is a facial violation of Section 542.058(a) when the appraisal award is paid out side of Section 542.058(a)'s sixty-day deadline. Nor do we see the same significance that he sees in the invalidity provision of Section 542.058(b). The concurrence construes this subsection to require an insurer to prove that it is not liable on the policy to avoid the sixty-day deadline of Section 542.058(a). From this premise, that opinion concludes that requiring an

36

insured to prove liability under Section 542.060 would read Section 542.058(b) out of the Act. But that conclusion assumes that both provisions address the same issue. We conclude that the invalidity provision addresses a different issue and does not create the dilemma that the concurrence sees in the Act.

### 2. Payment of an appraisal award does not trigger a violation of Section 542.058(a) of the TPPCA.

We will approach the analysis of Section 542.058 by first looking at Subsection (a) in isolation and then integrating the effect of Subsection (b) and our disagreement with the concurrence and that subsection's meaning.

Subsection (a) of Section 542.058 reads as follows:

> Except as otherwise provided, if an insurer, after receiving all items, statements, and forms reasonably requested and required under Section 542.055, delays payment of the claim for a period exceeding the period specified by other applicable statutes or, if other statutes do not specify a period, for more than 60 days, the insurer shall pay damages and other items as provided by Section 542.060.

Tex. Ins. Code Ann. § 542.058(a).

Crayton would read this section to potentially create liability when the insurer pays an appraisal award outside its sixty-day window. The payment of the appraisal award, in his view, becomes evidence to establish that the original claim decision of the insurer was in error and is thus evidence that retrospectively establishes that the insurer failed to comply with Section 542.058's sixty-day deadline. We disagree.

First, we note the supreme court's one signpost pointing to how it would construe Section 542.058. As noted above, the one thing that the supreme court said

37

when it left for another day the construction of Section 542.058 was "that when discussing the damages standard under the TPPCA and its predecessor, this Court has recognized the liability element for imposing TPPCA damages." *Barbara Techs.*, 589 S.W.3d at 824.[6] Thus, to the extent that the supreme court gave a preview of how it

---

[6]The supreme court cited a number of cases to support its statement:

*See Lamar Homes, Inc.*[ *v. Mid-Continent Cas. Co.*], 242 S.W.3d [1,] 16 [(Tex. 2007)] ("The prompt-payment statute provides that an insurer, who is 'liable for a claim under an insurance policy' and who does not promptly respond to, or pay, the claim as the statute requires, is liable to the policy holder or beneficiary not only for the amount of the claim, but also for 'interest on the amount of the claim at the rate of eighteen percent a year as damages, together with reasonable attorney's fees.'" (citation omitted)); [*Progressive Cty. Mut. Ins. v.*] *Boyd*, 177 S.W.3d [919,] 922 [(Tex. 2005)] (explaining that "[t]here can be no liability under [the TPPCA] if the insurance claim is not covered by the policy" because TPPCA damages are to be awarded when the insurer is liable under the policy (citation omitted)); [*Allstate Ins. v.*] *Bonner*, 51 S.W.3d [289,] 291 [(Tex. 2001)] ("To successfully maintain a claim under [the TPPCA], a party must establish three elements: (1) a claim under an insurance policy; (2) that the insurer is liable for the claim; and (3) that the insurer has failed to follow one or more sections of [the TPPCA] with respect to the claim.")[, *judgment withdrawn and superseded on reh'g by Allstate Ins. Co. v. Bonner*, No. 00-0282, 2001 WL 1412951 (Tex. June 21, 2001) (not designated for publication)]. And this is not the only court to discuss the TPPCA damages standard in such a way. *See, e.g.*, *Cox Operating, L.L.C.* [*v. St. Paul Surplus Lines Ins.*], 795 F.3d [496,] 505–09 [(5th Cir. 2015)] ("[Section] 542.058 provides an alternate payment deadline to the one set out in § 542.057 . . . . As referenced in § 542.058, § 542.060 provides the enforcement mechanism for [the TPPCA's] deadlines . . . . In sum, the [TPPCA] (1) imposes on insurers a series of claims-handling deadlines, §§ 542.055–.058; and (2) enforces those deadlines by requiring insurers who fail to comply with them (and who ultimately are liable on the claim) to pay statutory interest." (citations omitted)); *Tremago, L.P.* [*v. Euler-Hermes Am. Credit Indem. Co.*], 602 F. App'x [981,] 983–84 [(5th Cir. 2015) (per curiam)] (holding that "[i]n order to prevail on a [TPPCA]

38

would view Section 542.058, that section does not abrogate an insured's need to establish policy liability on the part of the insurer.

The question becomes whether the subsequent payment of the appraisal award is probative of failure to comply with the Act because the payment of that award indicates that the insurer failed to pay the claim within sixty days "after receiving all items, statements, and forms reasonably requested and required under Section 542.055." Tex. Ins. Code Ann. § 542.058(a). In essence, to read the appraisal process into Section 542.058(a) requires the payment of an appraisal to be tied to the process of Section 542.055 by making the payment an act showing a failure of the insurer to act after having "all items, statements, and forms reasonably requested and required under Section 542.055."

First, the structure of Section 542.058(a) in combination with the separate tracks on which the supreme court placed the TPPCA and the appraisal process sever the connection. Creating the connection violates the general principle of *Barbara Technologies* that places the claim-assessment process of the TPPCA in a separate track from the appraisal process.

---

claim, the insured must show '(1) a claim under an insurance policy (2) for which the insurer is liable and (3) that the insurer has not followed one or more sections' of the Act," and that without an admission or finding of liability, the insurer's settlement payment did not subject it to TPPCA damages (citation omitted)).

*Barbara Techs.*, 589 S.W.3d at 824.

39

Second, tying the appraisal process to Section 542.055 is contrary to how *Barbara Technologies* specifically carried forward the distinction between the appraisal and the deadlines of the TPPCA in its treatment of Section 542.055, the predicate for a violation of Section 542.058(a). This more specific treatment appears in the supreme court's rejection of the insurer's argument that "its initiation of the contractual appraisal process constituted an additional information request under [S]ection 542.055(b), extending the TPPCA's deadline to accept or reject a claim." *Barbara Techs.*, 589 S.W.3d at 816.

The supreme court responded to this argument in two ways. First, it divorced the request and assessment of documents in the claim-assessment process established in Section 542.055 from the appraisal process:

> Under [S]ection 542.055(a), after receiving a claim, an insurer must acknowledge receipt, begin an investigation, and request from the claimant all items, statements, and forms that the insurer reasonably believes will be necessary to evaluate the claim. *See id.* § 542.055(a). The insured may then make "additional requests" for information when necessary "during the investigation of the claim." *See id.* § 542.055(b). We read "additional" to reference the initial information, meaning that the TPPCA authorizes the insurer to request information from the claimant in two phases: (1) an initial request made within fifteen business days of receiving the claim for information the insurer believes "at that time" will be required; and (2) additional requests for information revealed to be necessary during the course of the investigation. *Because [the insurer's] appraisal demand was based on its contractual right to engage in a specific dispute resolution process and was not a request for items, statements, or forms from [the insured] to secure final proof of loss, we conclude that [the insurer's] use of the appraisal process falls outside the scope of [S]ection 542.055.*

*Id.* (emphasis added).

40

The supreme court then offered an additional reason why invocation of the appraisal process was not a part of the insurer's claim-investigation process as follows:

> Further, [S]ection 542.056(a) specifies that the "insurer shall notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss." *Id.* § 542.056(a). *As such, the rejection or acceptance of a claim is the insurer's acknowledgment that it had all the information it needed from the claimant to determine whether the claimant was entitled to benefits under the policy. Because an insurer's rejection of a claim is based on all information the insurer deemed necessary, as well as the insurer's investigation, later invocation of the policy's appraisal provision does not somehow start the investigatory period anew.* **Where the policy provides for an appraisal process if the parties "disagree on the value of the property or the amount of loss," as the policy here does, and the appraisal process was initiated only after [the insurer] rejected the claim, having determined that the value of the covered loss was below the deductible, use of the contractual appraisal process was not part of the insurer's investigation.**

*Id.* at 816–17 (emphases added) (footnote omitted). Carrying forward this theme, the supreme court later noted that "when an insurer complies with the TPPCA in responding to the claim, requesting necessary information, investigating, evaluating, and reaching a decision on the claim, use of the contract's appraisal process does not *vitiate* the insurer's earlier determination on the claim." *Id.* at 823 (emphasis added).

Thus, in continuing to draw the demarcation between the claim process and the contractual appraisal process, the supreme court seems to draw another line. That line is that the existence of an appraisal award does not show that the insurer had failed to timely respond to the claim because the appraisal process is not a part of the claim process. Because Section 542.058(a) creates a deadline tied to the claim process

41

found in Section 542.055's trigger of the insurer's receiving all the documents that it had requested and that are required to make a claim assessment, the supreme court divorces the claim-assessment process from the appraisal process. The later payment of an appraisal award is not a trigger to the determination that the insurer has failed to meet the deadlines required in the claim-assessment process.

And, again, more broadly, using an appraisal award as evidence of a violation of Section 542.058 is another attempt to open a back door into the prohibited territory of using the appraisal process to establish liability under the TPPCA. A construction that attempts such a maneuver is inconsistent with the overall separation of the appraisal process from TPPCA liability.[7] To permit the appraisal award to be probative of whether there was a Section 542.058(a) violation based on the insurer's failure to pay within sixty days "after receiving all items, statements, and forms reasonably requested and required under Section 542.055" violates the line the supreme court drew in *Barbara Technologies* to separate the appraisal process from TPPCA liability and to require that liability to be shown by evidence that goes beyond the payment of the appraisal award.

---

[7]*See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("[T]here can be no justification for needlessly rendering provisions in conflict if they can be interpreted harmoniously."); *see also* Tex. Gov't Code Ann. § 311.021(2) ("In enacting a statute, it is presumed that . . . the entire statute is intended to be effective[.]").

And such a construction would once again undermine the appraisal process. An insurer who triggered the appraisal process would be creating the evidence needed by its opponent to trigger an automatic violation of Section 542.058.

Limiting ourselves for the moment to Subsection (a) of Section 542.058, the majority opinion of *Barbara Technologies* seems to answer most of the issues that the concurrence raises to support its view that there could be no violation of Section 542.060 but that there must be violation of Section 542.058. First, for the reason just explored, we reject the premise that the payment of an appraisal award sets a violation of Section 542.058 in motion based on the failure to pay the claim within sixty days "after receiving all items, statements, and forms reasonably requested and required under Section 542.055."

Second, the majority specifically rejected the concurrence's conclusion that payment of the appraisal award in and of itself constitutes an acceptance of the claim. *Id.* at 823 n.14 ("JUSTICE BOYD [in the concurrence] would hold that voluntarily paying the appraisal amount constitutes acceptance of the claim. . . . We disagree.").

Third, the majority appears to disagree with the concurrence's premise that Section 542.058 must apply to the claim because Section 542.060 cannot. Again, the concurrence's reasoning is that so long as the insurer timely notified the insured of its rejection of the claim, the insurer satisfied all of the Act's deadlines. Because the insurer was "in compliance" with the Act, there was no violation of Section

43

542.060(a) that requires a showing that the insurer "was 'not in compliance with' the Act. Tex. Ins. Code [Ann.] § 542.060(a)." *Id.* at 839 (Boyd, J., concurring & dissenting).

Instead, the majority appears to have left open the possibility that a Section 542.060 violation can occur when the insurer rejects a claim and the insured later obtains a judgment that the insurer is liable on the policy and thus wrongfully rejected the claim.[8] Presumably the insured can predicate an insurer's lack of compliance on Section 542.058's deadline (through means other than payment of the appraisal award) once it establishes that the insurer is liable on the claim and did not pay the claim within the sixty-day deadline of Section 542.058(a).

> **3.   We disagree with the concurrence that Section 542.058(b) requires the conclusion that an insurer has violated Section 542.058 when it rejects a claim and later pays an appraisal award.**

---

[8]As *Barbara Technologies* held,

> Section 542.060(a) specifies that, "[e]xcept as [otherwise] provided . . . , if an insurer that is *liable* for a claim under an insurance policy is not in compliance with this subchapter, the insurer is liable to pay" the insured damages as specified by this section. *See* Tex. Ins. Code [Ann.] § 542.060(a) (emphasis added). We see no way under the language of the TPPCA that an insurer can be "liable" on the claim within the meaning of [S]ection 542.060 until it (1) has completed its investigation, evaluated the claim, and come to a determination to accept and pay the claim or some part of it; or (2) been adjudicated liable by a court or arbitration panel. *If an insurer rejects a claim, it has concluded based on its investigation and evaluation that it owes no benefits under the policy and is not liable for the claim; unless and until the insurer later accepts the claim, thereby admitting liability, or there is a judgment that the insurer wrongfully rejected the claim, the insurer is not "liable for a claim under an insurance policy" under [S]ection 542.060.*

*Id.* at 819–20 (majority opinion) (emphasis added).

The majority in *Barbara Technologies* refused to join issue with the concurrence on its construction of the word "invalidity" in Section 542.058(b). *Id.* at 828 n.19 (majority opinion) ("We do not address the relationship between 'liable,' 'invalid,' 'should be paid,' and 'right to receive benefits,' as that issue has not been raised or briefed in this Court."). As we have noted, the concurrence places considerable emphasis on Section 542.058(b)'s language that Subsection (a) of that section "does not apply if 'it is found as a result of arbitration or litigation that a claim received by an insurer is invalid and should not be paid by the insurer.'" *Id.* at 837, 839, 842 (Boyd, J., concurring & dissenting) (citing Tex. Ins. Code Ann. § 542.058(b)). The concurrence repeatedly describes that subsection as creating in effect a mirror image of Section 542.060's liability standard. *See id.* at 837–43.

The concurrence relied on that interpretation to support its view that Section 542.058 rather than Section 542.060 creates the operative deadline for payment when the insurer pays an appraisal award; its reasons were primarily two-fold. *See id.* at 839. First, according to the concurrence, Subsection (b) demonstrates that Sections 542.058 and 542.060 cannot be read together. *Id.* at 838. In its view, Section 542.058(b) places the burden of proof on the same issue as Section 542.060's liability language, but unlike Section 542.060, which places the burden to show liability on the insured, Section 542.058(b) places its burden on the insurer. *Id.* Second, the concurrence reasoned that requiring an adjudication that an insurer is liable before the

45

sixty-day deadline applies would render meaningless Section 542.058(b) because that subsection requires the insurer to prove that the claim is invalid by placing the burden on the insurer to establish that it is not liable before being freed from the sixty-day deadline. *Id.* We conclude that the concurrence asks the word "invalidity" in Section 542.058(b) to do too much work.

First, if our conclusion that the payment of an appraisal award does not trigger the deadline of Section 542.058(a), then not applying Section 542.058(b) to a claim involving the appraisal process would not be reading the subsection out of the Act. If the payment of the appraisal award does not trigger a violation of Section 542.058(a) in the first place, then the exception in Section 542.058(b) becomes irrelevant because it provides an exception to a provision that never applied in the first place.

Second, we disagree with the concurrence's conclusion that proving an insurer is liable on a claim and a finding that a claim is invalid are, what we perceive him to say, images that mirror each other. If the legislature intended for Section 542.058(b) to be the mirror image of the liability standard of Section 542.060, that choice is not reflected in the plain language of the Act. The starting point for the meaning of an undefined term in a statute is its "common, ordinary meaning unless a contrary meaning is apparent from the statute's language. . . . To determine a statutory term's common, ordinary meaning, we typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities." *Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n*,

511 S.W.3d 28, 34–35 (Tex. 2017). Black's Law Dictionary defines "invalid" to mean "1. Not legally binding <an invalid contract>. 2. Without basis in fact <invalid allegations>." *Invalid*, Black's Law Dictionary (11th ed. 2019). But a claim may be valid, and the insurer still not be liable.

As a general proposition, an insurer may not be liable on a valid claim; that is exactly the situation involved in both this case and *Barbara Technologies*. Homeowners and the insurer in *Barbara Technologies* did not contend that the insured's claim was invalid, i.e., without a basis in fact. Instead, the claim was valid, but the insurers were not liable because the valuation of the damages fell below the policies' deductibles. On the basis of the plain meaning of the word "invalid" and its application in the specific circumstances of Crayton's claim and of the insured in *Barbara Technologies*, we must disagree with the concurrence that the invalidity provision of Section 542.058(b) and the liability provision of Section 542.060(a) are equal but opposite because they create burdens of proof on the same issue.

Third, though it is somewhat dim guidance, we look to the legislative history of the TPPCA to give context to how the provision came into existence, and it does not appear that the invalidity provision of Section 542.058(b) was included to place a burden on an insurer to prove that it was not liable in order to avoid a violation of Section 542.058(a). This supports our conclusion that Section 542.058(b)'s invalidity provision meant something other than placing a burden on the insurer that to avoid

47

strict liability if it paid the claim outside Section 542.058(a)'s sixty-day deadline, it had to prove that it was not liable on the claim.[9]

House Bill 2 in 1991 proposed enactment of Section 21.55 of the Insurance Code, which is the predecessor to the present version of the TPPCA. *See* Tex. H.B. 2, 72nd Leg., R.S. (1991); *see also* Act of May 27, 1991, 72nd Leg., R.S., ch. 242, § 11.03, 1991 Tex. Gen. Laws 939, 1043–45 (originally codified as Tex. Ins. Code Ann. § 21.55), *amended by* Act of May 20, 2003, 78th Leg., R.S., ch. 1274, § 2, 2003 Tex. Gen. Laws 3611, 3681. The Association of Fire and Casualty Companies in Texas raised the following objection to adding the Act's penalties on top of already existing causes of action that punish bad faith and expressed the fear that the additional penalties might force insurers to pay claims that were not valid:

> Adding this additional penalty and confusion on top of current laws
> could discourage insurers from contesting possible fraudulent or

---

[9]We recognize that legislative history is not an appropriate aid to construe an unambiguous statute but cite the history to give context to how the invalidity provision of Section 542.058(b) came into existence. This limited use of legislative history is permissible:

> [Legislative] history may be appropriate to give context to our construction. *E.g.*, *Ojo v. Farmers [Grp.], Inc.*, 356 S.W.3d 421, 430 (Tex. 2011) (referencing legislative history to show that the Legislature was aware of the possibility of negative consequences of its language when it drafted the statute at issue); *see also*[] *id.* at 436–48 (Jefferson, C.J., concurring) (observing that the court's use of legislative history did not depart from the general rule: "When used in this contextual manner, there is little reason to think legislative history inappropriate for citation[]").

*Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 844 n.6 (Tex. 2018).

48

questionable claims, i.e., such as arson, and could distract from the duty of insurers to pay only *valid* claims. The Committee must be aware that the rates insurance consumers pay could be adversely affected if insurers are paying too much in claims dollars for either fraudulent or questionable claims because of the threat of bad faith.

Tex. H. Comm. on Ins. Minutes 14, 72nd Leg., R.S. (Mar. 4, 1991) (emphasis added).[10]

When introduced, the bill contained the following provision that gave an insurer grace from the Act's deadlines when it faced a potentially baseless claim:

(b)(1) If suspicion of [a] false claim or criminal activity giving rise to the claim results in the institution of a bona fide investigation of the claim, the company shall pay the amount of the claim into an escrow account, where it shall remain until the investigation is concluded with no finding of culpability on the part of the insured or other claimant or until a criminal verdict or civil settlement or judgment is entered on the record of the case, whichever is later, except that the company may at any time pay the claimant. If the investigation is concluded with no finding of culpability on the part of the insured or other claimant, or if no criminal charges are preferred and no civil suit for [a] false claim [is] brought within a reasonable time as determined by the rule of the board, or if a criminal prosecution arising from the claim is dismissed or results in acquittal or results in a mistrial and is not retried, the money in the escrow account, including accrued interest, becomes the property of the insured. If the investigation leads to criminal prosecution which results in conviction or if in a civil suit a decision is reached in favor of the company under the burden of proof requirements of Article 21.58 of this code, the money in the escrow account, including accrued interest, becomes the property of the company.

Tex. H.B. 2 (introduced version), 72nd Leg., R.S. (1991).[11]

---

[10]The minutes can be found at the following URL: https://lrl.texas.gov/scanned/legisCmteMinutes/houseCmtes/72-0/Insurance/0304 1991.pdf (last visited Dec. 11, 2020).

As the bill evolved, so did the provision suspending the Act's deadlines when the insurer had a basis to question the validity of a claim. The House Committee's substitute bill contained a provision that began to take the shape of what would evolve into Section 542.055 of the Act, which contained the language that we highlight to address fraudulent claims:

> Sec. 2. NOTICE OF CLAIM. (a) Except as provided by Subsection (d) of this section, an insurer shall, not later than the 15th business day after the receipt of notice of a claim:
>
> > (1) acknowledge receipt of the claim;
> > (2) commence any investigation of the claim;
> > (3) request from the claimant all items, statements, and forms that the insurer reasonably believes will be required from the claimant.
>
> (b) If the acknowledgement of the claim is not made in writing, the insurer shall make a record of the date, means, and content of the acknowledgement.
>
> (c) For purposes of this section, receipt of a notice of a claim by an agent of an insurer is the equivalent of receipt by the insurer, unless the agent notifies the claimant that the agent is not authorized by the insurer to receive a notice of a claim.
>
> *(d) If an insurer has a reasonable basis to believe that the claimant has fraudulently caused or contributed to the loss, based on specific information available for review by the department, the insurer is not required to satisfy the requirements of Subsection (a) of this section.* The commissioner may adopt rules requiring an insurer to submit a report if an insurer does not satisfy the requirements of Subsection (a) in accordance with this subsection.

---

[11]The text of the introduced bill can be found at the following URL: https://lrl.texas.gov/LASDOCS/72R/HB2/HB2_72R.pdf#page=194 (last visited Dec. 11, 2020).

*See* Legislative Reference Library of Texas, H.B. 2, 72nd Leg., R.S., House Comm. Substitute, https://lrl.texas.gov/LASDOCS/72R/HB2/HB2_72R.pdf#page=743 (emphasis added) (last visited Dec. 11, 2020).

The House Committee's substitute bill also contained a Section 3(e) within the section titled "Acceptance or Rejection of Claims." Section 3(e) included a deadline to accept or reject a claim and excepted from its deadline claims that were in litigation:

> (e) Not later than the 90th day after the date an insurer notifies a claimant under Subsection (d) of this section, the insurer shall accept or reject the claim or shall notify the claimant of the reasons the insurer needs additional time. The insurer shall notify the claimant again before the 90th day of each subsequent 90-day period during which the claim is not settled. *The insurer need not provide the notice required by this subsection if the claim is the subject of pending arbitration or litigation.*

*See id.* https://lrl.texas.gov/LASDOCS/72R/HB2/HB2_72R.pdf#page=745 (emphasis added) (last visited Dec. 11, 2020).

In turn, the adopted version of the bill deleted the highlighted Section 2(d) (dealing with claims the insurer asserted were fraudulent) and the highlighted language of Section 3(e) (dealing with claims in litigation), left Subsection (a) and (b) of Section 2 intact, and then melded those provisions into what would eventually become Section 542.058(a) and (b) of the present TPPCA:

> (f) Except as otherwise provided, if an insurer delays payment of a claim following its receipt of all items, statements, and forms reasonably requested and required, as provided under Section 2 [now section 542.055] of this article, for a period exceeding the period specified in other applicable statutes or, in the absence of any other specified period, for more than 60 days, the insurer shall pay damages and other items as provided for in Section 6 of this article.

51

(g)  If it is determined as a result of arbitration or litigation that a claim received by an insurer is invalid and therefore should not be paid by the insurer, the requirements of Subsection (f) of this section shall not apply in such case.

Act of May 27, 1991, 72nd Leg., R.S., ch. 242, § 11.03, 1991 Tex. Gen. Laws 939, 1044 (amended 2003).  The adopted version also added the liability provision that eventually became Section 542.060 of the present TPPCA.[12]

This evolution is hardly conclusive.  But the evolution of the provision gives a context that points to a conclusion that Section 542.058(b) was intended to deal with the insurance industry's concern that the TPPCA would be forced to pay invalid claims out of fear of the Act's deadlines and penalties.  At the least, the evolution contains no indication that the legislature intended what would eventually become Section 542.058(b) to create a mirror to the liability provision of Section 542.060.

### 4.	We explain how we interpret Section 542.058(b).

[12]The Senate Committee Report included a Section 6 that would eventually become the penalty provision found in Section 542.060 of the present TPPCA.  *See* Legislative Reference Library of Texas, H.B. 2, 72nd Leg., R.S., Senate Committee Report, https://lrl.texas.gov/LASDOCS/72R/HB2/HB2_72R.pdf#page=1861 (last visited Dec. 14, 2020).  In the Senate Committee Report, Subsection (f) repeated the language of the penalty provision and provided that if the insurer exceeded the sixty-day deadline, "the insurer shall pay the amount of the claim owed and payable plus 18 percent per annum on that amount.  The insurer shall also pay the claimant any reasonable attorney fees arising from the claimant's efforts to collect payment for the claim."  *Id.* at https://lrl.texas.gov/LASDOCS/72R/HB2/HB2_72R.pdf#page=1860 (last visited Dec. 14, 2020).  A Senate Floor Amendment revised the language to provide "the insurer shall pay damages and other items as provided for in Section 6 of this article."  *Id.* at https://lrl.texas.gov/LASDOCS/72R/HB2/HB2_72R.pdf#page=2066 (last visited Dec. 14, 2020).

Based on the lack of symmetry between the liability concept of Section 542.060 and the invalidity found in Section 542.058(b), we conclude that it is not a harmonious reading of the Act to give the later section the expansive reading or the role that the concurrence gives it.[13] In our view, Subsection 542.058(b) has a place by clarifying that the sixty-day deadline in Section 542.058(a) does not trigger TPPCA liability or a reading that once the sixty-day deadline has passed the insurer has lost the ability to challenge the claim in general. Instead, the passing of the sixty-day deadline does not impair the insurer's ability to challenge the claim's validity and to prove that it has no basis in fact.

To give Section 542.058(b) the reading given by the concurrence appears to give the subsection a priority that it does not warrant. With Section 542.060 establishing the conditions for liability of the Act and the supreme court's seeming endorsement that there is a liability element for imposing TPPCA damages, to read Section 542.058(b) as creating a separate standard for TPPCA liability gives it a

---

[13]We strive to read the terms of a statute in harmony with the other provisions contained in the statute:

> "But we will not give an undefined statutory term a meaning that is out of harmony or inconsistent with other provisions in the statute." *In re Hall*, 286 S.W.3d 925, 928–29 (Tex. 2009) [(orig. proceeding)]. "[I]f a different, more limited, or precise definition is apparent from the term's use in the context of the statute, we apply that meaning." *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013) (per curiam).

*Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 41 (Tex. 2020).

prominence in the Act that seems inconsistent with its subordinate position as an exception to one of the Act's deadlines.[14]

Indeed, this inconsistency is brought to the fore in the concurrence's argument that if there is a Section 542.060 violation, it can only come from the failure to meet the Section 542.058 sixty-day deadline.[15] Application of this approach means that the primary liability standard of the Act found in Section 542.060 is subordinated to and read out of the Act because of the language of Section 542.058(b).[16]

---

[14]*Barbara Technologies* also left for another day its construction of the words "the insurer shall pay damages and other items as provided by [S]ection 542.060," which is the concluding phrase of Section 542.058(a). 589 S.W.3d at 824; *see* Tex. Ins. Code Ann. § 542.058(a). We do not read these words as having significance if our premise—that payment of the appraisal award does not trigger the conditions for a violation of Section 542.058—is correct. The condition that would implicate the refenced penalties has not occurred with the payment of the award.

[15]The concurrence argued,

But as the Court agrees, [the insurer] fully complied with the Act by timely acknowledging, investigating, and rejecting the claim and providing its reasons for rejecting. If [the insurer] was "not in compliance with" the Act, its only possible act of non-compliance would be its failure to comply with [S]ection .058's sixty-day payment deadline. If [the insurer's] only non-compliance was with [S]ection .058, then that section must control whether [the insurer] owes interest and fees. And as explained, [S]ection .058 requires [the insured] to pay interest and fees unless an arbitration or litigation determines that the claim was *invalid and should not* have been paid.

*Barbara Techs.*, 589 S.W.3d at 839 (footnote omitted).

[16]We do reject one argument made by Homeowners. It suggests that the trial court's summary judgment may be sustained because its original loss assessment was reasonable in light of the appraisal award. The comparison process underlying this

54

## VI. Conclusion

Homeowners' no-evidence motion for summary judgment challenged Crayton to produce a scintilla of evidence of a TPPCA violation. Crayton argues he did so with the very evidence that Homeowners relied on to support its motion because that evidence met his burden to create a fact issue on whether a TPPCA violation had occurred. It is Crayton's view that the payment of the appraisal award was made in a way that Homeowners, in essence, admitted that its original rejection was in error and that the amount of the loss found by the appraisal award should have been paid

---

argument has its origin in *Breshears*, 155 S.W.3d at 345, and has become a construct relied on by the federal courts in dealing with TPPCA claims. *See Mainali Corp. v. Covington Specialty Ins.*, 872 F.3d 255, 259 (5th Cir. 2017) (citing *Breshears* to support the statement "[a]t a minimum under those state court decisions, there is no statutory violation because [the insurer] made a pre[-]appraisal award that was undeniably reasonable"). Relying on this process both the federal courts and some Texas courts have looked at prior precedent to determine what ratio was found to be reasonable and then formulaically applied the ratio to determine if the insurer's pre-appraisal payment was reasonable. *See, e.g.*, *Lakeside FBBC, LP v. Everest Indem. Ins. Co.*, No. SA-17-CV-491-XR, 2020 WL 1814405, at *12 (W.D. Tex. Apr. 8, 2020) (order on motion for summary judgment); *Hinojos v. State Farm Lloyds*, 569 S.W.3d 304, 313 (Tex. App.—El Paso 2019, pet. granted) ("Accordingly, because [the insurer] made a reasonable payment on [the insured's] claim within the sixty-day statutory limit, the subsequent payment resulting from the appraisal process did not mean [the insurer] violated the prompt payment deadlines of the insurance code.").

We reject this approach to TPPCA liability because we see no language in the Act to support such an approach. *Barbara Technologies* quoted *Breshears* but ended its quotation before the words that other courts have relied on to derive the ratio standard, and the supreme court has granted the petition for review in *Hinojos*. *See Barbara Techs.*, 589 S.W.3d at 821–22 (quoting *Breshears*, 155 S.W.2d at 345, but deleting words from the quote that the insurer "provided a reasonable payment within a reasonable time"). Further, the very premise of comparing the original loss adjustment and the appraisal is contrary to the demarcation between the two that we see in *Barbara Technologies*' holding.

within the deadlines of the TPPCA. Further, in Crayton's view, the jury should compare Homeowners' original loss assessment and the appraisal award to decide whether Homeowners violated Section 542.060 because it was liable on the claim and had failed to comply with the Act's deadlines or had violated the Act because the appraisal payment was made outside Section 542.058(a)'s sixty-day deadline.

We do not agree that Homeowners admitted that its original rejection of the claim was in error. To the contrary, Homeowners made its payment by noting that it was doing so "[i]n accordance with the appraisal award."

We also hold that to meet the "is liable" standard of Section 542.060(a) requires something other than evidence of a disparity between the original damage determination and the appraisal. If we agreed with Crayton, we would be violating the principle of *Barbara Technologies* that consigns the adjudication of liability and the appraisal process to separate and distinct roles.

Finally, we do not agree that the facts point to a violation of Section 542.058(a)'s sixty-day deadline for payment of claim, either as a freestanding violation of the TPPCA or as an event showing that the insurer is not in compliance with the Act as required by Section 542.060(a). Section 542.058(a) ties its violation to a failure to comply with Section 542.055. As we read *Barbara Technologies*, the claim process described by Section 542.055 is divorced from the appraisal process. Thus, the trigger for a Section 542.058 violation is not pulled by the payment of an appraisal award. Nor do we agree with the concurrence that only Section 542.058 can apply when an

56

insurer rejects a claim and that the consequence of a construction holding otherwise renders the invalidity provision of Section 542.058(b) meaningless.

We overrule Crayton's issue challenging the granting of Homeowners' no-evidence motion for summary judgment and do not reach his second issue challenging the granting of the traditional motion for summary judgment. *See* Tex. R. App. P. 47.1. We affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: December 23, 2020